OPINION
Appellant, M. Susan Jackson, filed this lawsuit against appellees, Champaign National Bank Trust Co. ("the bank"); Michael J. Lamping, the bank president; and William Bostelman, appellant's former supervisor. In her complaint, appellant alleged sex discrimination and retaliation. The Franklin County Court of Common Pleas granted appellees' motion for summary judgment on both claims. Appellant appeals the trial court's judgment and presents the following assignments of error:
 I. THE TRIAL COURT ERRED IN GRANTED DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF'S CLAIM OF SEX DISCRIMINATION.
 2. THE TRIAL COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF'S CLAIM OF RETALIATION.
Appellate court review of a summary judgment motion isde novo. Helton v. Scioto Cty. Bd. of Commrs. (1997), 123 Ohio App.3d 158,162. "As a result, [appellate] court[s] appl[y] the same summary judgment standard as the trial court and must affirm the trial court's judgment if any valid grounds are found on appeal to support it, even if the trial court failed to consider those grounds." Coventry Twp. v. Ecker (1995), 101 Ohio App.3d 38,41-42. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court."Mergenthal v. Star Banc Corp. (1997), 122 Ohio App.3d 100, 103.
Pursuant to Civ.R. 56(C), summary judgment may be granted when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in its favor. Civ.R. 56(C); State ex rel. Grady v. State Emp. RelationsBd. (1997), 78 Ohio St.3d 181, 183. The moving party bears the initial burden of informing the trial court of the basis for the motion and identifying the portions of the record that establish the absence of a genuine issue of fact on a material element of the non-moving party's claim. Dresher v. Burt (1996), 75 Ohio St.3d 280,292-293. After the moving party satisfies this initial burden, the non-moving party bears a reciprocal burden to respond by affidavit, or as otherwise provided in Civ.R. 56, and must set forth specific facts showing the existence of a genuine issue for trial. Civ.R. 56(E). If the non-moving party fails to so respond, summary judgment, if appropriate, shall be entered against him. Civ.R. 56(E).
For the reasons that follow, we affirm the judgment of the trial court.
Appellant was hired by the bank in 1988 to work in its Urbana, Ohio office. During the next five years, she rose through the ranks from secretary to loan processor to loan processing supervisor to credit administration officer. Lamping joined the bank as president in 1993. In November 1994, appellant was promoted to Business Banking Officer. In that capacity, appellant handled commercial and consumer loans.
In late 1996, appellant met with her supervisor, Bruce Lauer, to develop her professional goals for 1997. Appellant's goals were memorialized in a one-page document entitled "1997 Goals for Sue Jackson." Among other things, the list of goals included attainment of $12 million in residential real estate loans, $1 million in new commercial loans, and $200,000 in new demand deposit accounts. Although appellant acknowledges that eight of the nine goals listed in the document were indeed her own personal goals, she believed that the $12 million goal for residential real estate loans was a bank-wide goal. Appellant believed, therefore, that she was only responsible for some portion of this overall goal for residential real estate.
In July 1997, Bostelman replaced Lauer and became appellant's supervisor. In October or November 1997, Bostelman asked all the commercial loan officers, including appellant, to prepare analyses of their year-to-date performance vis-a-vis their 1997 goals. Appellant informed Bostelman that she had met or exceeded many of the goals on her list. She also indicated, however, that she had attained $4,459,227 in residential real estate loans and $92,306 in new demand deposit accounts. Both of these results fell short of the goals on appellant's list.
In November 1997, Bostelman completed performance evaluations for several loan officers, including appellant. Bostelman rated appellant's overall performance as "below expected." Bostelman wrote the following in the evaluation:
 Weighing the goals set of 13 million in new loans higher than the other objectives, it would seem Sue has fallen far short of what was expected at $5.8 million in new loans. In addition, she obtain [sic] only 46% of what would seem to be a small DDA goal of $200,000. [Jackson Depo. I, Exhibit 7.]
Pursuant to the bank's policy, appellant was not entitled to a bonus for 1997 or to a pay raise in 1998 because she was evaluated as below expected. Prior to the year-end 1997 evaluation, appellant had never received a rating less than "as expected," and she was dissatisfied with Bostelman's evaluation. Although the bank could have given appellant a discretionary bonus, it did not.
Appellant received Bostelman's evaluation some time between December 6, and December 22, 1997. On December 22, 1997, appellant met with Lamping, the bank president, to discuss the evaluation. Appellant explained that Bostelman had mistakenly interpreted the $12 million loan goal as her individual goal, rather than a bank-wide goal. According to appellant, Lamping told her that he agreed with Bostelman's evaluation. She alleges that Lamping also told her that she had been performing as a consumer lender, not as a commercial lender. According to appellant, Lamping told her that he would be adjusting her job description from Business Banking Officer to Consumer Lender, and reducing her job grade level from an "H" to an "F." There is no evidence, however, that appellant's job grade or pay was ever reduced.
Lamping concedes that he ultimately agreed with the evaluation, although he testified that he did not tell appellant about his decision until some time in January 1998, after he had a chance to determine whether appellant had met her goals. According to Lamping, appellant deserved the "below expected" rating even if the $12 million goal were a bank-wide goal because the bank fell short of that goal by $3 million.
Appellant testified that she decided to leave the bank in December 1997, when she received the low evaluation from Bostelman, and she resolved to start looking for other employment after the first of the year. According to appellant, the low evaluation was the last straw. Appellant testified that she had also been the victim of belittling and demeaning treatment by Bostelman and Lamping. Specifically, appellant testified that Bostelman and Lamping had ignored her in group meetings, even when she raised her hand. She claims that Bostelman invited male officers to lunch but excluded her. Finally, she testified about an incident in which she questioned Bostelman's instructions regarding a loan transaction, and he told her, "Just do it because I said so. I get tired of people arguing with me." (Jackson Affidavit, at paragraph 54.) Appellant provided the affidavits of four female bank employees who generally testified that Bostelman and Lamping ignored or humiliated women at the bank. With regard to appellant specifically, two of the affiants testified that Lamping referred to her sarcastically as "Super Sue." (See Nancy Zerkle Affidavit, at paragraph 12; Cynthia Joe Stimmel Affidavit, at paragraph 6.)
After her December 22, 1997 conversation with Lamping, appellant delivered a memorandum to Patricia Cromwell, the bank's Human Resources Officer. In the memorandum, appellant stated the following:
 I do not agree with my 1997 Performance Evaluation of below expected. Of the six Business Banking Officers employed by the Champaign Bank, I have exceeded the loan sales of all but one of the male lenders. It was not expressed to me by my immediate supervisor at my mid year review nor at any other time that my performance was below average. The monthly loan reports and the magnitude of my loan portfolio indicated that I was performing above the other male lenders of my grade level. [(Emphasis added.) Jackson Depo. I, Exhibit 9.]
In January 1998, appellant applied for a job with Chase Manhattan Mortgage ("Chase Manhattan"). She had an interview on January 26, 1998.
On February 11, 1998, Lamping met with appellant and proposed that she move to the bank's Plain City, Ohio office. Lamping testified that he thought the move would be a positive professional opportunity for appellant because: (1) it was closer to her new home in Hilliard, Ohio; (2) it was where her two largest commercial customers were located; and (3) it was closer to growth area where the bank anticipated profitably lending. Appellant, however, testified that she perceived the transfer to be an effort to drive her out of her job by placing her in a branch with significantly smaller lending volume than Urbana. She told Lamping that she would prefer to stay in Urbana. She admits, however, that she agreed to move if her transfer would serve the bank's best interests. Consequently, Lamping sent a company-wide memorandum reporting on appellant's lateral transfer to Plain City. In it, Lamping noted that appellant would continue with her current duties as the bank-wide product manager for mortgage loans. Although there is no evidence that appellant's salary or job title was impacted by the transfer, appellant believed that the move forecasted disaster, as she would not be able to meet her goals in Plain City. Moreover, appellant testified that Bostelman told her that the Plain City branch did not do a sufficient volume of business to warrant an officer position.
On February 19, 1998, Chase Manhattan offered appellant a job, and she promptly accepted. She submitted her letter of resignation during the same week that she was to transfer to the Plain City branch. Her last day with the bank was March 6, 1998. On March 18, 1998, appellant received a letter from the bank requesting that she reimburse the bank $334, the cost of tuition that the bank paid for appellant to attend two classes at Clark State during the Fall of 1997.
In her first assignment of error, appellant contends that the trial court erred in granting summary judgment in appellees' favor on appellant's sex discrimination claim. Appellant argues that the trial court improperly ignored direct evidence of sex discrimination. She further argues that the court erred by requiring her to prove that she was replaced by a man. Finally, appellant argues that the court erred in finding that she was not qualified for her job.
R.C. 4112.02(A) forbids an employer "to discharge without just cause * * * or otherwise to discriminate against [any] person with regard to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment" on the basis of gender. Ohio courts have held that, when interpreting R.C. Chapter 4112, it is appropriate to look at analogous federal statutes and case law. See Wooten v.Columbus Div. of Water (1993), 91 Ohio App.3d 326, 334.
In order to prevail in an employment discrimination case, the plaintiff must prove discriminatory intent. Mauzy v.Kelly Services, Inc. (1996), 75 Ohio St.3d 578, 587-588. "Discriminatory intent may be proven either directly or indirectly." Goad v. Sterling Commerce, Inc. (June 13, 2000), Franklin App. No. 99AP-321, unreported; see Byrnes v. LCICommunication Holdings Co. (1996), 77 Ohio St.3d 125, 128-129. A plaintiff who seeks to prove discrimination by direct evidence "must prove a causal link or nexus between evidence of a discriminatory statement or conduct and the prohibited act of discrimination to establish a violation." Byrnes, at 130. "Absent some causal connection or link between an employer's discriminatory statements or conduct and a plaintiff-employee, there is no permissible inference that the employer was motivated by discriminatory animus to act against the plaintiff-employee."Id. "The mere fact that an employer may have discriminated against other employees, standing alone, is insufficient." Id.
Appellant argues that the resignation of eleven women from the bank's Urbana branch in the Spring of 1998, plus the testimony from herself and several co-workers that Lamping and Bostelman ignored and belittled women, provides sufficient direct evidence of discrimination to defeat summary judgment. However, appellant fails to link this evidence to her performance evaluation, her alleged demotion or her transfer to Plain City. Without evidence of a causal link, appellant has not provided proof of discriminatory intent using direct evidence.
Although appellant cannot establish discrimination with direct evidence, she may prove her case under the familiar burden-shifting analysis articulated by the United States Supreme Court in McDonnell Douglas Corp. v. Green (1973), 411 U.S. 792. In order to prevail on her claim of disparate treatment, appellant must first establish a prima facie case of sex discrimination by showing that: (1) she is a member of a protected class; (2) she was similarly situated to employees who were not members of the protected class; and (3) she was treated differently from such employees. Mitchell v. Toledo Hosp. (C.A.6, 1992), 964 F.2d 577,583. If appellant establishes a prima facie case, the bank must articulate a legitimate, nondiscriminatory reason for its action. Appellant must then prove that the bank's stated reason was in fact a pretext for discrimination. See McDonnell Douglas, at 802-804.
A plaintiff is "similarly situated" to others only where "the individuals with whom the plaintiff seeks to compare [her] treatment * * * have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Ercegovich v. Goodyear Tire Rubber Co. (C.A.6, 1998), 154 F.3d 344, 352. In her gender discrimination claim, appellant claims that similarly-situated men in the bank were not given poor performance evaluations, were not demoted and were not constructively discharged. Appellant failed to provide sufficient facts, however, to create a genuine issue that she was treated differently than similarly-situated male employees. In an effort to prove that her evaluation, demotion and discharge were the product of disparate treatment, appellant compares herself to David Marbary, Steve Goodwin, Jim Marable and Roger File.
Marbary, a bank vice president who was responsible for generating agricultural loans, received an "above expected" rating in 1997. However, appellant and Marbary were dissimilar in at least two respects. First, Marbary had reported to Bostelman in November 1997, that Marbary was on target to meet his $14 million loan goal in 1997. Although appellant argues that data generated in January 1998 demonstrated that Marbary actually missed his goal, the undisputed evidence indicates that, at the time Bostelman completed the evaluations, he thought that Marbary would make his personal goal target. Second, Bostelman noted in his evaluation that Marbary had taken issue with the personal goal target and that Marbary's goal had been set unilaterally by the former head of the lending division. Although appellant now claims that her 1997 goal was also unfair, she did not raise this allegation until after she filed her lawsuit. Steve Goodwin, who received an "as expected" rating, also had informed Marbary that he was on target to meet his personal goals. Jim Marable was evaluated as "exceeded expectation," but he had not been given any personal goals for 1997. Roger File received a "superior" rating in 1997, but appellant admitted that File "is the golden boy. He does a good job." (See Jackson Depo. at 179.)
The undisputed evidence therefore establishes that, as of the date that Bostelman completed his performance evaluations, only appellant had reported that she was not on target to achieve the goals on her list. The fact that she and Bostelman disagreed whether the $12 million goal was a personal goal or a bank-wide goal is not material, nor is the fact that Bostelman relied on his subordinates' self-reporting appraisals in rating performance, even if those appraisals were erroneous. A plaintiff "does not raise a material issue of fact on the question of the quality of [her] work merely by challenging the judgment of [her] supervisors." McDonald v. Union Camp Corp. (C.A.6, 1990),898 F.2d 1155, 1160. Even when the evidence is construed in her favor, appellant has failed to establish that she was treated differently than similarly-situated men.
Appellant also alleged discriminatory treatment with regard to her alleged demotion from Business Banking Officer to Consumer Lender. There is no evidence that the alleged demotion ever came to fruition; appellant's salary and benefits were not reduced. Even if appellant had been reclassified, however, she failed to offer any evidence that she was treated differently from similarly-situated men. It is undisputed that, in contrast with other Business Banking Officers, appellant generated the bulk of her business from consumer lending.
The portion of appellant's gender discrimination claim based on constructive discharge fails for additional reasons. Discriminatory constructive discharge occurs only when an employer, with discriminatory intent, makes working conditions so intolerable that a reasonable person in the employee's shoes would have felt compelled to resign. Mauzy, at 588-589; Neal v.Hamilton Cty. (1993), 87 Ohio App.3d 670, 676. In applying this test, the court must determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent. Mauzy, at 589. "Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." (Emphasis sic.)Garner v. Wal-Mart Stores, Inc. (C.A.11, 1987), 807 F.2d 1536,1539.
Appellant provided no evidence that her termination was objectively imminent. Appellant speculated that her evaluation and transfer were a means to drive her out of the company and that a decrease in her pay was inevitable. The evidence, however, points to the contrary. As detailed above, appellant failed to establish that her evaluation was a product of discrimination. Her evaluation, therefore, cannot provide evidence of constructive discharge. See Yates v. Avco Corp. (C.A.6, 1987), 819 F.2d 630,637 (to establish constructive discharge based on discrimination, there must be an underlying action for discrimination). Moreover, appellant's pay and benefits were not decreased, and she was going to be performing the same type of job function at the Plain City branch. Furthermore, appellant testified that she decided to find another job in December 1997, and she had interviewed at Chase Manhattan weeks before she even learned about the transfer to Plain City. There is simply no evidence that she was constructively discharged.
Appellant's first assignment of error is overruled.
In her second assignment of error, appellant asserts that the trial court erred when it granted summary judgment for appellees on appellant's retaliation claim. Appellant contends that the trial court improperly concluded that she had not engaged in protected activity.
Under R.C. 4112.02(I), it is an unlawful discriminatory practice:
 (I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.
When analyzing retaliation claims, Ohio courts rely on federal case law. Chandler v. Empire Chem., Inc., Midwest Rubber CustomMixing Div. (1994), 99 Ohio App.3d 396, 402.
To prove a claim of retaliation, a plaintiff must establish the following three elements: "(1) that she engaged in protected activity, (2) that she was subjected to an adverse employment action, and (3) that a causal link exists between a protected activity and the adverse action." Peterson v. BuckeyeSteel Casings (1999), 133 Ohio App.3d 715, 727. "Once a plaintiff successfully establishes a prima facie case, it is the defendant's burden to articulate a legitimate reason for its action." Id. If the defendant meets its burden, the plaintiff must demonstrate that the articulated reason was a pretext for discrimination. Id.
"In order to engage in a protected opposition activity * * * a plaintiff must make an overt stand against suspected illegal discriminatory action." Comiskey v. Automotive Industry ActionGroup (E.D.Mich. 1999), 40 F. Supp.2d 877, 898. "[A] vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." Booker v. Brown Williamson Tobacco Co., Inc. (C.A.6, 1989), 879 F.2d 1304, 1313.
The adverse action need not result in pecuniary loss, but it must materially affect the terms and conditions of plaintiff's employment. Peterson, at 727. Factors that courts consider when determining whether an employment action was materially adverse include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Crady v. Liberty Nat'l Bank and TrustCo. (C.A.7, 1993), 993 F.2d 132, 136.
Appellant's retaliation claim fails for two reasons. First, based on the facts in this case, her December 22, 1997 letter to Patricia Cromwell does not constitute protected activity. In her letter, appellant merely makes vague references to gender, comparing her performance to that of the male lenders in her office. Because all the other lenders were males, appellant's letter does not alert the bank that appellant believed she was being treated unfairly because of her gender. SeeBooker, at 1309 (summary judgment warranted because plaintiff's complaints about ethnocism were too vague to constitute protected activity).
Nor has appellant provided evidence that she was subject to an adverse employment action in the wake of her letter to Cromwell. Although appellant hypothesizes that her transfer to Plain City constitutes adverse action, there is no evidence that appellant's salary, benefit, title or responsibility would change as a result of the transfer. See Garner, at 1539 (employee who believes she may be experiencing employment discrimination is obligated "not to assume the worst, and not to jump to conclusions too fast"). Appellant's efforts to prove a causal link between protected activity and adverse action are further undermined by the facts that she agreed to the transfer, having already decided more than a month before her transfer that she would find another job and resign from the bank.
Similarly, appellant has failed to provide any evidence of a causal link between her letter to Cromwell and the bank's request for reimbursement for the classes appellant attended at Clark State. The bank provided evidence that it requested reimbursement pursuant to its policy that tuition would be paid for employees who remain with the bank for at least six months after completing the courses. Appellant provided no evidence to suggest that the bank applied its policy in an unlawful manner.
Appellant's second assignment of error is overruled.
For the foregoing reasons, appellant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.